IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

RONALD JONES,

Plaintiff,

v.

SANKO STEAMSHIP CO., LTD, S.K. SHIPPING CO., LTD, GRANDSLAM ENTERPRISE CORP., HARMONY STEVEDORING SERVICES, and HYUNDAE SHIP'S SUPPLY CO.,

Defendants.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 10-6787 (JBS/KMW)

**OPINION**

APPEARANCES:

Scott A. Portner, Esq.
Stanley B. Gruber, Esq.
FREEDMAN & LORRY, P.C.
1601 Market Street, Suite 1500
Philadelphia, PA 19103
Attorneys for Plaintiff

Charles P. Neely, Esq.
Richard Q. Whelan, Esq. (*pro hac vice*)
PALMER BIEZUP & HENDERSON LLP
330 Market Street
Camden, NJ 08102
Attorney for Defendant Grandslam Enterprise Corp.

Jeffrey S. Moller, Esq.
James J. Quinlan, Esq.
BLANK ROME LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Attorneys for Defendant S.K. Shipping Co. Ltd.

**SIMANDLE, Chief Judge:**

**Table of Contents**

I. INTRODUCTION .......... 2
II. FACTUAL AND PROCEDURAL BACKGROUND .......... 7
A. SK's Shipping Contract with LWI and Charter of the SANKO 7
B. SK's Malaysian Loading Operations of the SANKO .......... 9
C. SK's Camden Discharging Operations of the SANKO .......... 12
1. The "cut" sling and Plaintiff's Injuries .......... 16
III. STANDARD OF REVIEW .......... 19
IV. DISCUSSION .......... 20
A. Section 905(b) Duties under the LHWCA, Generally .......... 21
1. Turnover Duty of Grandslam, the "bareboat charterer" .. 25
a. Plaintiff cannot establish a prima facie breach of Grandslam's turnover duty .......... 28
b. No contract, positive law, or custom supplants the application of the general duties under Scindia .......... 32
2. Turnover duty of SK, the "time charterer" .......... 36
a. Genuine issues of fact preclude the entry of summary judgment in favor of SK .......... 37
b. Genuine issues of fact preclude a finding that the "cut" sling was "open and obvious" .......... 41
V. CONCLUSION .......... 43

## I. INTRODUCTION

While working as a longshoreman on Camden, New Jersey's Pier No. 1 during cargo operations conducted by his employer, the Delaware River Stevedores, Inc. (hereinafter, "DRS"), on M/V SANKO SUMMIT (hereinafter, "SANKO"), Plaintiff Ronald Jones (hereinafter, "Plaintiff") suffered serious injuries when a "cut" sling parted, and caused a pre-slung plywood bundle to fall on his legs. There is no dispute that the sling, which is

made of rope of almost one inch in diameter, contained a cut that had penetrated about 80% of the thickness near the loops in the sling that were used to hoist the cargo from the hold to the dock, where Plaintiff awaited.

As a result of these injuries, Plaintiff brings claims under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b) (hereinafter, the "LHWCA"), against a bevy of entities,[1] including the owner of the SANKO, Defendant Sanko Steamship Co. Ltd (hereinafter, "Sanko Steamship"),[2] the bareboat charterer/owner *pro hac vice* of the SANKO, Defendant GrandSlam Enterprise Corp. (hereinafter, "Grandslam"),[3] the "time charterer" of the SANKO and owner of the rope sling at issue in this litigation, Defendant SK Shipping Co., Ltd. (hereinafter,

---

[1] Plaintiff could not, however, sue his employer DRS, because the LHWCA obligated DRS to compensate him and provide reimbursement for his medical costs and expenses, but otherwise immunized it from suit. See 33 U.S.C. §§ 903, 904. 905(a), 907.

[2] As a result of Sanko Steamship Co. Ltd.'s August 8, 2012 bankruptcy petition, the Court stayed this case as against Sanko Steamship on September 12, 2012. [See Docket Item 57.] As explained later, however, Grandslam in essence stands in the shoes of Sanko Steamship for purposes of this litigation, and its absence therefore has no impact on the disposition of the pending motions.

[3] In simple terms, a bareboat charterer (commonly referred to as a demise charterer) assumes control of a vessel in "bare" condition and must provide a crew to navigate and maintain it in seaworthy condition. Dougherty v. Navigazione San Paolo, S.P.A. Medafrica Line, 622 F. Supp. 1, 1 (E.D. Pa. 1984). In that way, the bareboat charterer becomes the owner *pro hac vice*, and succeeds to responsibilities and obligations equivalent to that of the vessel owner. See id. As a result, the Court will use the term vessel owner, bareboat charterer, and owner *pro hac vice* interchangeably.

"SK" or "SK Shipping"),[4] the Korean contractor that maintained SK's rope slings prior to their application to the plywood cargo,[5] Defendant Hyundae Ship Supply Co. (hereinafter, "Hyundae Supply"), and the stevedoring company that loaded the plywood in the Malaysian port of Tanjung Manis, Defendant Harmony Stevedoring Services (hereinafter, "Harmony Stevedoring").[6]

Following years of discovery, Grandslam and SK now separately move for summary judgment, based upon their belief that the undisputed record demonstrates, as a matter of law, that they breached none of the duties owed to Plaintiff under section 905(b) of the LHWCA or general maritime law. Grandslam, as the bareboat charterer/owner *pro hac vice* of the SANKO, specifically argues that it cannot, as a matter of law, be found

[4] In contrast to a bareboat charterer, a time charterer obtains use of a vessel's carrying capacity for a fixed charter period, while the vessel owner (bareboat charterer or owner *pro hac vice*) retains control of the vessel's management and navigation. See Dougherty, 622 F. Supp. at 1.

[5] Plaintiff additionally brought claims against the owner of the cargo of pre-slung bundled plywood being discharged by DRS at the time of his injuries, Defendant Liberty Woods International (hereinafter, "LWI" or "Liberty Woods"). On May 27, 2015, however, Plaintiff voluntarily dismissed his claims against LWI with prejudice. [See Docket Item 123.]

[6] Despite service pursuant to international convention [see Docket Items 58 & 61], neither Harmony (a Malaysian entity) nor Hyundae (a South Korean entity) have ever responded to the claims asserted against them in this litigation. As a result, the Clerk of Court entered default (but not default judgment) against Harmony on October 15, 2012 [see Docket Item 60], and against Hyundae on March 27, 2013. [See Docket Item 64.] Plaintiff shall notify the Court of his intentions vis-à-vis these Defendants within seven (7) days from entry of this Court's Opinion and Order.

in breach of its duties under section 905(b) of the LHWCA, because the disputed sling came aboard the SANKO after the vessel had been turned over to the independent stevedore hired by SK, and because it had no part in the use of the rope slings, nor any involvement in the loading of the plywood cargo. (See generally Grandslam's Br. at 21-38; Grandslam's Reply at 3-10.) As a result, Grandslam claims that it had no duty to inspect or supervise the Malaysian stevedore's use of rope slings in connection with the plywood shipment, and cannot be charged with any negligence based upon the condition of the disputed rope sling. (See generally Grandslam's Br. at 21-38; Grandslam's Reply at 3-10.) SK, as time charterer of the SANKO, similarly argues that it breached no duties in relation to Plaintiff's injuries, because no evidence reflects that SK had responsibility for, knew of, or should have known of the deep "cut" on its rope sling, and because maritime law entitled SK to rely upon the expertise of the independent stevedores (here and abroad). (See generally SK's Br. at 21-38; SK's Reply at 3-10.) Indeed, given the nature of the damage to the rope sling—being "cut" rather than "frayed or worn" from use—SK submits that Plaintiff "cannot prove that [it] failed to act reasonably." (SK's Reply at 1-3.)

Plaintiff, by contrast, takes the position that factual issues relative to Grandslam's and SK's discharge of their

duties preclude the entry of summary judgment in either parties' favor. (See generally Pl.'s Grandslam Opp'n at 22-37; Pl.'s SK Opp'n at 23-48.) Plaintiff points, in particular, to evidence that Grandslam failed to inspect the cargo slings or to otherwise ensure the condition of the slings prior to the commencement of cargo operations in Camden (see Pl.'s Grandslam Opp'n at 26-38); and to evidence that SK separately failed to discover, remedy, prevent, and/or disclose the dangerous condition of the rope slings. (See Pl.'s SK's Opp'n at 32-48.)

The parties are in agreement (1) that the rope sling at issue came aboard the SANKO while in port at Tanjung Manis; (2) that the exact source of the "cut" cannot be scientifically determined (or drawn out through the robust discovery in this action); and (3) that that the single "cut" could have occurred at any time prior to Plaintiff's incident. Against this backdrop, this case calls upon the Court to consider the duties, if any, owed to stevedoring longshoremen by "bareboat" and "time charterers" under section 905(b) of the LHWCA, Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156 (1981), Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92 (1994), and general maritime law. More specifically, the Court must determine the nature of the independent duties, if any, owed by Grandslam and SK to Plaintiff as an off-loading longshoremen, and must then consider whether genuine issues of fact exist on whether each

entity acted in compliance with those duties in relation to the "cut" rope sling.

For the reasons that follow, Grandslam's motion for summary judgment will be granted, and SK's motion for summary judgment will be denied.[7]

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. SK's Shipping Contract with LWI and Charter of the SANKO[8]

SK Shipping, a company headquartered in Seoul, Korea, specializes in providing shipping services for owners of various commodities.[9] (See SK's SMF at ¶ 1; Pl.'s SMF at ¶ 1.) In early

[7] The Court heard oral argument upon both motions on November 24, 2015.

[8] Although SK and Grandslam moved separately for summary judgment, each motion substantively relies upon the same factual record, and references the same deposition transcripts, agreements, and graphics. (Compare Grandslam's SMF, with SK's SMF.) For that reason, the Court will discuss the factual background relative to the pending motions together.

[9] The Court derives the undisputed facts stated herein from the parties' various statements of material facts, affidavits, and exhibits, unless otherwise indicated, and recounts them in the manner most favorable to Plaintiff. However, the Court disregards, at it must, those portions of the parties' statements of material facts that either lack citation to relevant record evidence and/or contain legal argument or conclusions. See generally L. CIV. R. 56.1(a). As a result, many aspects of SK's and Plaintiff's lengthy statements of material facts have been disregarded (at least in part) as plainly improper under Local Civil Rule 56.1(a), on account of their inclusion of legal argument, factual statements without accompanying record citations, and/or for otherwise reciting factual irrelevancies. (See, e.g., SK's SMF at ¶¶ 23-24, 42, 75, 91 (making legal arguments concerning the inferences and/or conclusions to be drawn from various pieces of evidence); Pl.'s Grandslam SMF at ¶¶ 17, 32, 43-47, 50, 79, 89-90 (setting forth "disputed facts" without accompanying record citations), ¶¶ 55,

2010, Liberty Woods contracted with SK to transport a ship-load of "plywood in bundles" from manufacturers in various ports in Malaysia and Indonesia to the United States. (See SK's SMF at ¶ 1; Pl.'s SMF at ¶ 1.)

In order to ship Liberty Woods' plywood, SK Shipping entered into a "Time Charter" agreement with Sanko Steamship on October 2, 2010, in which it "time chartered" the SANKO, a bulk carrier made up of eight (8) discrete open-hatch cargo holds. (See Ex. C to SK's SMF; Pl.'s SK SMF at ¶¶ 2-4; Grandslam's SMF at ¶ 23; SK's SMF at ¶ 53.) SK then separately arranged for "[a]t least 22,400 rope slings"[10] to be delivered to the vessel by Hyundae Supply, the Korean entity that long-maintained SK Shipping's inventory of "previously used slings."[11] (SK's SMF at

---

118-123 (making various legal arguments concerning Grandslam's various duties); Pl.'s SK SMF at ¶¶ 90-95 (making various legal arguments, based upon "disputed facts" without accompanying record citations).)

[10] In its reply briefing and at oral argument, SK made much of certain "shipment records" that indicate "that only 22,400 of the 24,945 slings (or 90%) of the slings" came from "SK's inventory at Hyundae." (SK's Reply at 14.) SK, in turn, argues (without any citation to record evidence) that this discrepancy creates an inference that some portion of the rope slings used on the SANKO must have been new. (See id.) SK, however, simultaneous concedes (intentionally or otherwise) that the rope sling at issue here came from the 22,400 used slings provided by Hyundae. (See, e.g., SK's SMF at ¶¶ 7, 38.) Nevertheless, because the parties do not genuinely dispute that the "cut" occurred from some factor other than prior use, SK's claimed discrepancy has little impact on the pending motion.

[11] Plaintiff acknowledges that Hydunae's services to SK ordinarily included sorting, inspecting, and testing SK's inventory of previously used slings, but disputes the nature of

¶¶ 7, 12-13; see also Lee Dep. at 18:20-19:18; Ex. 20 to Pl.'s SK SMF (stating that Hyundae sorted only "used slings" for use on the SANKO).) These slings consisted of 22mm ($^7/_8$ inch) three-strand polypropylene rope, with a minimum rated breaking strength of 15,225 lbs.[12] (See Att. C to Flory Rep.; SK's SMF at ¶ 9; Ex. 33 to Pl.'s Grandslam SMF (Bill of Lading relative to Hyundae's shipment of rope slings).)

**B. SK's Malaysian Loading Operations of the SANKO**

In advance of shipping, the plywood manufacturer readied the plywood for shipment by stacking, banding, and covering sheets of plywood to create a rectangular bundle, which measured four feet in width, two feet in height, and eight feet in length, and weighed approximately 2,000 lbs. (See Att. C to Flory Rep.; SK's SMF at ¶ 31; Pl.'s SK SMF at ¶ 31.) Independent foreign stevedores then loaded and stowed the SANKO's hold with bundles of plywood (among other goods) in five

the testing performed by Hyundae relative to the sling at issue here (see, e.g., Pl.'s Grandslam SMF at ¶ 41; Pl.'s SK SMF at ¶ 36), because Hyundae itself stated that it only "sorted used slings per [its] strict standard" and then conducted (through another entity) a "sample [strength] test" of only a select few. (Exs. 20 & 24 to Pl.'s Grandslam SMF.)

[12] No party disputes the ordinary adequacy of these rope slings for purposes of the plywood bundles at issue here. (See SK's SMF at ¶ 10; Pl.'s SK SMF at ¶ 10.)

ports throughout Malaysia and Indonesia.[13] (See SK's SMF at ¶ 26; Grandslam's SMF at ¶ 27; Pl.'s SK SMF at ¶ 26.)

As relevant here, cargo operations in Tanjung Manis, Malaysia took place from March 20, 2010 to March 25, 2010, under the supervision of SK's Malaysian Port Captain Jeong Hyun Kim.[14] (See Grandslam's SMF at ¶ 28; Pl.'s Grandslam SMF at ¶ 28; Kim Dep. at 104:8-113:19 (describing SK's loading port captain duties relative to cargo operations).) Indeed, on the first day of cargo operations, Port Captain Kim performed a "visual" inspection of the rope slings, and then held a "pre-loading meeting" at which time he instructed cargo workers (including the Malaysian stevedores) to separate and discard any damaged slings.[15] (Kim Dep. at 35:1-17, 45:22-46:2, 113:10-19; Ex. 22 to Pl.'s SK SMF (Kim Statement of Facts regarding cargo operations in Malaysia).)

Harmony Stevedoring then positioned barges alongside the SANKO and lifted, loaded, and stowed 10,176 plywood bundles—

[13] These ports specifically included (1) Tawau, Malaysia; (2) Sandaken, Malaysia; (3) Samarinda, Indonesia; (4) Tanjung Manis, Malaysia; and (5) Bintulu, Malaysia.

[14] The focus of the discovery in this action, and the Court's factual recitation, centers upon Tanjung Manis, because the parties agree that the pre-slung plywood bundle at issue in this litigation came aboard the SANKO in port at Tanjung Manis. (See, e.g., SK's SMF at ¶ 27; Pl.'s SK SMF at ¶ 27.)

[15] Nevertheless, SK never received any reports of broken or problematic cargo pre-slings during loading operations in Tanjung Manis, nor at any other Malaysian port. (Grandslam's SMF at ¶ 48; Pl.'s Grandslam SMF at ¶ 48.)

either by chains or rope slings—into one of SANKO's eight cargo holds.[16] (See Grandslam's SMF at ¶¶ 32, 52; Pl.'s Grandslam SMF at ¶¶ 32, 52.)

Once loaded within the cargo hold, Harmony's "loading longshoremen" then wrapped rope slings around the bundles and oriented the ends (or, eyes) of the slings on top, so that the bundles would be "pre-slung" and accessible for easy offloading in the port of destination.[17] (SK's SMF at ¶¶ 33-34; Ex. X to SK's SMF (depicting the pre-slung cargo); Pl.'s SK SMF at ¶¶ 33-34.) As a result of these efforts, all of the crated plywood loaded and stowed in port at Tanjung Manis[18] ultimately consisted of pre-slung bundles.[19] (See Grandslam's SMF at ¶ 32; Pl.'s

---

[16] The Malaysian stevedores placed these plywood bundles on top of and covering the previously stowed cargo from prior ports. (See, e.g., Grandslam's SMF at ¶ 56.) Following loading, the stevedores covered the plywood (and slings) with a layer of "'Kraft' paper" to protect it from any seawater that might leak through the hatch covers. (SK's SMF at ¶ 55; see also Ex. X to SK's SMF (depicting the loaded and covered cargo); Pl.'s SK SMF at ¶ 55.)

[17] LWI requested this pre-slinging as part of its standard practice in connection with crated plywood cargo. (Grandslam's SMF at ¶¶ 37-38; Polatchek Dep. at 301:7-13, 327:15-328:8.)

[18] The cargoes carried aboard the SANKO in prior ports, by contrast, did not include any pre-slung cargoes (of the crated plywood variety or otherwise). (See Grandslam's SMF at ¶ 35; Ex. 19 to Grandslam's SMF (setting forth the SANKO's Voyage Memo); Pl.'s Grandslam SMF at ¶ 35.)

[19] As explained on the oral argument record of November 24, 2015, and in the parties' various submissions, the Malaysian stevedores loaded some of the plywood bundles into the hold with the rope pre-slings already attached, while others were applied to the bundles after being stowed. (See, e.g., Pl.'s Grandslam SMF at ¶ 32.)

Grandslam SMF at ¶¶ 3, 32; Ex. S to SK's SMF (depicting pre-slung plywood crates during loading in Tanjung Manis).)

**C. SK's Camden Discharging Operations of the SANKO**

Following an international voyage, the SANKO arrived at its first U.S. port of call, Pier 1 of the Broadway Terminal in Camden, on May 4, 2010. (See SK's SMF at ¶ 40.) In order to unload the SANKO at the port, SK engaged DRS, a domestic stevedoring company that SK had engaged "on many prior occasions," and one with extensive experience discharging pre-slung bundles of crated plywood. (SK's SMF at ¶¶ 41, 67; see also Pl.'s SK SMF at ¶ 41, 67; Lee Dep. at 72:10-13.) DRS then selected the "'plywood gear'" necessary to discharge cargo pre-slung with rope slings,[20] a spreader and four yellow DRS nylon slings, and attached this gear to the SANKO's crane hooks. (Grandslam's SMF at ¶¶ 43, 59, 61; Pl.'s Grandslam SMF at ¶ 59; Exs. 20 & 21 to Grandslam's SMF (depicting a crane hook, spreader, and four nylon slings, all connected to a pre-slung plywood bundle in Camden); SK's SMF at ¶ 65.) In that way, the gear collectively used for the discharge of the plywood cargo consisted of various discrete components that DRS connected together, including: (1) SANKO's crane and crane wire, (2) DRS's

[20] In other words, DRS proceeded to cargo operations well aware of the pre-slung nature of the cargo within the SANKO's holds. (See, e.g., Grandslam's SMF at ¶ 66; Exs. 20 & 21 to Grandslam's SMF.)

spreader bar, wire rope/cargo hooks, and flat yellow nylon web straps, and (3) SK's rope slings.[21] (See SK's SMF at ¶ 43; Pl.'s

---

[21] In order to lift the rectangular plywood bundles, the DRS stevedores attached a square spreader and spreader bar to the SANKO's crane wire, with a section of wire rope ending in a cargo hook streaming downward from each corner of the square. (See DiNapoli Rep. at ¶ 20.) DRS then used the flat yellow nylon web straps to connect the plywood bundle rope slings to the cargo hooks on the spreader bar, by weaving the nylon strap through the eye of the rope slings and then reattaching the nylon strap to one of the cargo hooks hanging from the spreader. (See id. at ¶¶ 21; see also Exs. 20 & 21 to Pl.'s Grandslam SMF; Grandslam's SMF at ¶¶ 78-81.) In graphic form, this configuration would appear as follows:




(DiNapoli Rep. at ¶ 20 (as modified by the Court).) A typical plywood draft, in turn, consisted of four pre-slung bundles (two crates per bundle), with one bundle descending from each of the

SK SMF at ¶ 43; Exs. 20 & 21 to Grandslam's SMF.)

Prior to the start of discharging operations, however, SK's U.S.-based Port Captain Se Jin Joo conducted a "pre-discharging meeting" at which time he instructed cargo workers (including DRS) to separate and discard any damaged slings. (Ex. 38 to Pl.'s SK SMF; Joo Dep. at 18:21-22:13.) DRS then selected its cargo gear, and commenced cargo operations under the supervision of five different DRS supervisors, and without significant guidance from Captain Joo and/or the SANKO's officers and crew.[22] (See SK's SMF at ¶¶ 42-43; Pl.'s SK SMF at ¶¶ 42-43; Grandslam's SMF at ¶ 83.) These operations specifically began on May 5, 2010, with "three gangs of [DRS] longshoremen" dispersed throughout SANKO's cargo holds 3, 5, and 8, the SANKO's cranes, as well as the terminal dock. (Grandslam's SMF at ¶¶ 43, 59, 61; Pl.'s Grandslam SMF at ¶ 59; SK's SMF at ¶ 65; DiNapoli Rep. at ¶¶ 4-6.)

During the first day of cargo operations, discharging occurred in the following fashion:

---

spreader bar's four cargo hooks. (See Grandslam's SMF at ¶ 82; Pl.'s Grandslam SMF at ¶ 82.)

[22] These supervisors (and their years of experience) specifically included (1) DRS Manager of Vessel Operations Michael Billups (10 years of experience); (2) DRS Stevedore Supervisor John Eberle (at least 30 years of experience); (3) DRS Staff Consultant Captain James Hassall (17 years of experience); (4) DRS Ship Foreman Donald Hankinson (47 years of experience); and (5) DRS Gang Foreman John Mulgrew (one of DRS's "oldest and most experienced gang bosses"). (Grandslam's SMF at ¶¶ 61, 68-76; Pl.'s Grandslam SMF at ¶ 61; SK's SMF at ¶ 48.)

1. The DRS crane operator would lower the crane's wire into one of the SANKO's holds where DRS "hold persons" would connect the pre-slings to one of the hooks of the spreader bar by weaving a DRS nylon strap through the "eye loops" at the ends of the rope slings. (DiNapoli Rep. at ¶ 5; see also Flory Rep. at 2-6.)
2. The crane operator would then lift the draft up and out of the hold, pivot the crane over the SANKO's side, and slowly begin to lower the cargo towards the dock. (DiNapoli Rep. at ¶ 5; see also Flory Rep. at 2-6.)
3. As the load approached the surface of the dock (commonly referred to as "the hammer" or "doorway"), DRS's "doorway persons" would turn the load to orient it for easy removal by a fork lift, and would then disconnect the rope slings from the spreader/nylon strap assembly. (See DiNapoli Rep. at ¶ 6; see also Flory Rep. at 2-6.)
4. Following this, the crane operator would lift the spreader/nylon strap assembly back over the SANKO's side and into one of the holds for assembly of the next load, while DRS's "checker" would record the contents of the landed draft on the pier. (See DiNapoli Rep. at ¶ 6; see also Ex. 25 to Grandslam's SMF (setting forth DRS's tally reports for its cargo operations); see also Flory Rep. at 2-6.)

In that way, only DRS's "hold persons" within the cargo holds had a view of the condition of the rope slings at the time of discharge: first, when the "hold persons" connected the rope sling to the spreader through the nylon strap (thereby potentially exposing the portion of the rope slings nearest to the "eyes"); and then again when the load began its ascent out of the cargo hold (thereby exposing the portion of the rope

slings that covered the bottom of the plywood bundles).[23] (See Grandslam's SMF at ¶¶ 87-90; Pl.'s Grandslam SMF at ¶¶ 87-90.)

Productive cargo operations unfolded in this fashion until late in the evening on May 5, 2010, and then continued on May 6, 2010 throughout cargo holds 1, 2, 3, 5, and 7. (See, e.g., Ex. 18 to Grandslam's SMF (setting forth DRS's activity reports).) Indeed, during these first two days of cargo operations, DRS discharged more than 6,400 crates of pre-slung plywood cargo, and reported no issues relative to the cargo pre-slings (or otherwise).[24] (See Grandslam's SMF at ¶¶ 60, 86, 95, & 100.)

**1. The "cut" sling and Plaintiff's Injuries**

Circumstances changed, however, when the DRS crew led by DRS Gang Foreman John Mulgrew (hereinafter, "Foreman Mulgrew" and his "Mulgrew crew") resumed discharging pre-slung bundles from cargo hold 2 on May 7, 2010. (See SK's SMF at ¶ 72; Ex. Z to SK's SMF (setting forth DRS's activity report); Grandslam's SMF at ¶ 93; Pl.'s Grandslam SMF at ¶ 93.) On that day, the Mulgrew crew consisted of two "hold over" longshoremen, Daniel

---

[23] As discussed below, the parties genuinely dispute whether the location of the "cut" made it more likely than not that the "hold persons" would have or should have noticed it.

[24] DRS supervisors expected DRS's "hold persons" to look at the pre-slings and to systematically remove and replace any cut or damaged pre-slings. (See Grandslam's SMF at ¶¶ 97-99; Pl.'s Grandslam SMF at ¶¶ 97-99.) Indeed, DRS considered the removal of cut or damaged cargo pre-slings part of its normal discharging process. (See Grandslam's SMF at ¶ 99; Pl.'s Grandslam SMF at ¶ 99.)

Mortorano and Fred McAllister, two "door" longshoremen, George Matthews and Plaintiff, and one crane operator, Leo Mullen (see Grandslam's SMF at ¶¶ 100-105; Pl.'s Grandslam SMF at ¶¶ 100-105; SK's SMF at ¶¶ 66-68, 76), and discharging proceeded largely as usual for much of the morning. Indeed, at approximately 9:30 A.M., the DRS "hold over" longshoremen approached a plywood draft, looked at and handled the cargo slings, and then connected the rope sling to the hook of the cargo spreader with DRS's nylon strap. (See Mortorano Dep. at 89:12-22; McAllister Dep. at 65:10-24, 68:8-21, 69:7-19; SK's SMF at ¶¶ 79-80; Grandslam's SMF at ¶¶ 101-103.)

DRS crane operator Mullen then lifted the draft from the hold in two phases: first, he lifted the draft high enough to allow the "hold over" longshoremen to inspect the slings at the bottom of the draft; then, he lifted the draft out of cargo hold 2, swung the draft over towards the pier, and began to lower it.[25] (See Mullen Dep. at 62:18-70:17; Grandslam's SMF at ¶ 104; Pl.'s Grandslam SMF at ¶ 104.) At that time, Plaintiff, as the "doorway" longshoreman, approached the descending draft with his arms extended, in order to reach and "spin" the draft into

[25] Plaintiff concedes that the SANKO's crane (and crane operation) "had nothing whatsoever to do with [his] accident." (Grandslam's SMF at ¶ 115; Pl.'s Grandslam SMF at ¶ 115.)

position on the pier.[26] (Pl.'s Dep. at 170:20-172:4, 192:24-194:1, 286:3-16.) As the draft came within one to two feet from Plaintiff's grasp, he heard a "'pop'" and watched the plywood draft shift towards him, ultimately striking him on the legs. (SK's SMF at ¶ 83.)

Following this incident (and Plaintiff's removal by ambulance), the DRS supervisors examined the "parted sling" in the presence of SK Port Captain Joo, and discovered that it had somehow been "cut" through 80% of its thickness just below one of the "eyes."[27] (Billups Dep. at 131:1-132:3, 144:5-18; see also SK's SMF at ¶¶ 84-85; Pl.'s SK SMF at ¶¶ 84-85; Grandslam's SMF at ¶¶ 105, 108.) Nevertheless, DRS deemed the failed sling a "one off" or "fluke" incident, and the DRS supervisors made the decision to continue their use of the rope pre-slings in connection with the cargo operations. (Grandslam's SMF at ¶

[26] Despite the fact that Plaintiff testified to routinely standing underneath drafts of descending plywood, Plaintiff disputes whether Plaintiff stood directly underneath the disputed draft in this instance. (Compare SK's SMF at ¶¶ 68-69, with Pl.'s SMF at ¶¶ at 68-69.) This dispute, however, has no impact on the disposition of the pending motions, because no party advances the position that this entire incident would have been avoided by a slight change in Plaintiff's physical position on the pier.

[27] The parties engaged in a protracted period of discovery relative to Plaintiff's initial position that the parted sling parted on account of its frayed and worn condition. Nevertheless, Plaintiff and his expert ultimately conceded that the fibers of the rope sling had been cut, and that the cut occurred prior to SANKO's arrival in port at Camden. (See, e.g., Pl.'s SK SMF at ¶¶ 85-86.) The actual source and timing of the cut, by contrast, remains unknown.

109; Pl.'s Grandslam's SMF at ¶ 109; SK's SMF at ¶ 84; Pl.'s SK SMF at ¶ 84.) At 2:00 P.M. on the same day, however, a second rope pre-sling failed, and DRS Captain Hassall "immediately" directed DRS's crews to cease all discharging.[28] (Hassall Dep. at 126:1-10.) DRS then made the decision, together with SK Port Captain Joo, to use steel chains to discharge the remainder of cargo. (See Grandslam's SMF at ¶¶ 111-12; Pl.'s Grandslam SMF at ¶¶ 111-12; Hassall Dep. at 128:8-130:14.)

Following this incident, Plaintiff filed this litigation, claiming that he suffered an array of orthopedic, neurological, and internal injuries,[29] on account of the "carelessness and negligence" of Grandslam and SK.[30] (Second Am. Compl. at ¶¶ 26-28.) The parties thereafter proceeded to an extended period of pretrial discovery, and the pending motions followed.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Alabama v. North Carolina, 560

---

[28] The parties provide no detail regarding the condition of this second "parted" sling.

[29] These injuries allegedly include "crushing injuries to his right hip, right ribcage, cervical, thoracic and lumbar spines," and left ankle. (Second Am. Compl. at ¶ 28.)

[30] Grandslam, SK, and the other Defendants, in turn, asserted a series of Crossclaims against each other for contribution and/or indemnification. [See, e.g., Docket Items 87, 88, & 89.]

U.S. 330, 344 (2010) (citations and internal quotation marks omitted); see also Fed. R. Civ. P. 56(a).

In evaluating a motion for summary judgment, the Court must view the material facts in the light most favorable to the non-moving party, and make every reasonable inference in that party's favor. See Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014). An inference based upon "'speculation or conjecture,'" however, "'does not create a material factual dispute sufficient to defeat summary judgment.'" Halsey, 750 F.3d at 287 (citations omitted). Rather, the non-moving party must support each essential element with concrete record evidence. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," the Court may grant summary judgment. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

In simple terms, this action centers upon which entity, if any of the present Defendants, bears some legal responsibility for the failed rope sling that caused Plaintiff's injuries. This inquiry, in turn, requires a consideration of the various duties imposed upon the players most routinely involved in maritime shipping—the "bareboat" charterer/owner *pro hac vice*,

the "time charterer," and the stevedores. For that reason, the Court will first introduce the relevant framework, prior to turning to the specific contours of the duties owed by Grandslam and SK in this instance.

**A. Section 905(b) Duties under the LHWCA, Generally**

Throughout much of the 1900s, the admiralty doctrine of unseaworthiness effectively placed absolute liability upon a shipowner (and related entities) for injuries sustained by longshoreman and other non-seamen working on board a vessel while in port.[31] See Seas Shipping Co. v. Sieracki, 328 U.S. 85, 90-94 (1946) (discussing the doctrine of unseaworthiness); see also Marroquin v. Am. Trading Trans. Co., Inc., 711 F. Supp. 1165 (E.D.N.Y. 1988) (discussing pre-LHWCA admiralty law).

The enactment of the 1972 Amendments to the LHWCA, however, spelled the "demise" of an injured longshoreman's right to maintain a cause of action for unseaworthiness. Normile v. Maritime Co. of Philippines, 643 F.2d 1380, 1380 (9th Cir. 1981); see also 33 U.S.C. § 905(b). The LHWCA took away, in particular, absolute liability for injured longshoremen, and substituted a comprehensive statutory workers' compensation

[31] Although dressed in admiralty terms, the doctrine of unseaworthiness constituted merely a species of negligence, imposing strict liability upon a vessel owner for failure to supply a seaworthy vessel, equipment, and/or crew. See Smallwood v. Am. Trading & Transport Co., 839 F. Supp. 1377, 1379 (N.D. Cal. 1993) (discussing "the tortuous history of negligence and unseaworthiness in admiralty law").

scheme that restricts an injured longshoreman's ability to maintain a cause of action against a vessel owner or its agents to instances in which one of those entities acted negligently in relation to the injury.[32] See Hill v. Reederei F. Laeisz G.M.B.H., Rostock, 435 F.3d 404, 406 (3d Cir. 2006); see also 33 U.S.C. § 905(b)

Section 905(b) codifies the exclusive remedy for longshoremen, and specifically provides in pertinent part:

> In the event of injury to a person covered under this chapter caused by the negligence of a **vessel**, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title.... The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b) (emphases added). The LHWCA, in turn, defines a "vessel" within the meaning of section 905(b) to include "vessel's owner, owner *pro hac vice*, agent, operator, **charter** or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21) (emphases added). Although several courts have identified certain ambiguity in the definition of "vessel" under the LHWCA, extant authority reflects that the LHWCA plainly includes "time charterers" and

[32] In other words, the 1972 amendments to the LHWCA fundamentally changed the nature of third-party negligence actions initiated by longshoremen. See Howlett v. Birkdale Shipping Co., 512 U.S. 92, 97 (1994) (describing the "fundamental changes").

"bareboat charterers," as here, within its statutory scope.[33] See, e.g., Hudson v. Schlumberger Tech. Corp., 452 F. App'x 528, 536 (11th Cir. 2011); Becker v. Tidewater, Inc., 586 F.3d 358, 373 (5th Cir. 2009); Rodriguez v. Bowhead Trans. Co., 270 F.3d 1283, 1286 (9th Cir. 2001); Hines v. British Steel Corp., 907 F.2d 726, 729 (7th Cir. 1990); Kerr–McGee v. Ma–Ju Marine Servs., Inc., 830 F.2d 1332, 1338–39, 1343 (5th Cir. 1987); Migut, 571 F.2d at 356. Nevertheless, relevant precedent limits, in different ways, the types of negligence for which longshoremen can sue vessel owners, charterers, and the like.

In Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156 (1981) and Howlett v. Birkdale Shipping Co., 512 U.S. 92

[33] Differences emerge in how courts rationalize this interpretation, with some courts including "time charterers" by reference to the LHWCA's express language, while others include "time charterers" by extension of the LHWCA's intended purpose. In Migut v. Hyman-Michaels Co., 571 F.2d 352 (6th Cir. 1978), for example, the Court of Appeals for the Sixth Circuit determined that the definitional provisions of the LHWCA included, in essence, a typographical error, and construed the statute as covering time charterers rather than simply a "charter." Id. at 355-56. In Dougherty, by contrast, a judge of the Eastern District of Pennsylvania construed the LHWCA to include "time charterers" on account of the LHWCA's manifest purpose of enabling longshoremen to sue negligent third parties for injuries. 622 F. Supp. at 1. Despite these differences, the salient conclusion remains that "time charterers" fall within the statutory coverage of liability under section 905(b) of the LHWCA. As explained below, however, the sphere of duties changes dramatically depending upon the nature of the "vessel"-based entity sued. For that reason, and as discussed below, Grandslam's duties under section 905(b) as the "bareboat charterer" differ from the section 905(b) duties imposed upon SK as the "time charterer."

(1994), both landmark cases, the Supreme Court concluded that "vessels" within the meaning of section 905(b) owe three general duties to longshoremen:[34] (1) a "turnover duty," which relates to the condition of the ship upon commencement of stevedoring operations and includes a corollary duty to warn; (2) an "active operations duty," which requires that a "vessel" exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel;" and (3) a "duty to intervene," which imparts an obligation upon the "vessel" to intervene in certain circumstances in areas under the principal control of the independent stevedore.[35] Howlett, 512 U.S. at 98 (citing Scindia, 451 U.S. at 167-68).

[34] These general duties, as explained below, apply absent a contractual provision, positive law, or custom to the contrary. See Scindia, 451 U.S. at 172.

[35] SK claims that the Scindia duties do not squarely apply to it, given the "necessarily different and more limited" capacity of a time charterer (as opposed to Grandslam's more encompassing role as "bareboat charterer"). (SK's Br. at 24-25.) Plaintiff, in response, advances inconsistent positions: arguing at great length that the Scindia defines the contours of SK's duties (see Pl.'s SK Opp'n at 21-32), and then contrarily stating that the general "maritime negligence standard" of reasonable care governs SK rather than the Scindia duties. (Id. at 32-33.) The Court recognizes that neither Scindia nor Howlett involved a time charterer, and that in Kerr-McGee, the Court of Appeals for the Fifth Circuit expressed its view that Scindia "does not [expressly] set the duty of time-charterers." 830 F.2d at 1340 n.8 ("Though the Supreme Court used the word 'vessel' throughout its opinion, the context of the case, as well as the Court's alternate use of 'shipowner' throughout its opinion suggest that the duties prescribed in Scindia apply only to true owners."). Nevertheless, in Kerr-McGee, the Court of Appeals for the Fifth Circuit went on to determine the time charterer's duty within

Plaintiff alleges in this instance that Grandslam and SK each breached their turnover duty relative to pre-slung plywood cargo.[36] The nature of this duty, in turn, splinters in relation to Grandslam and SK. The Court now turns to the particular nuances relative to each moving Defendant, and then to whether issues of fact preclude summary judgment in favor of each Defendant.

**1. Turnover Duty of Grandslam, the "bareboat charterer"**

Based upon a "vessel owner's" or "bareboat charterer's" heightened control over a vessel, in Howlett, the Supreme Court explained the relevant turnover duty as follows:

> A vessel must 'exercise ordinary care under the circumstances' to turn over the ship and its equipment and appliances 'in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary

---

the same analytical framework as the Scindia Court. Id. at 1341-43. Even more, robust authority following and applying Scindia plainly reflects the nuanced duty analysis relative to time charterers and owners *pro hac vice*. See, e.g., Becker, 586 F.3d at 373 (describing the difference analysis, in light of the differences in scope of authority and responsibility). As a result, this dispute has little practical value here, because the essential analysis relative to SK's conduct remains the same, whether denominated as a Scindia analysis or one under more general maritime negligence principles. See Hines, 907 F.2d at 729 (concluding that the Scindia principles "apply with equal force" to a time charterer).

[36] Plaintiff concedes that the "active operations duty" and the "duty to intervene" have no application to the facts of this litigation. (See Pl.'s SK Opp'n at 2, 28-32; Pl.'s Grandslam Opp'n at 2, 26-33.)

> care' to carry on cargo operations 'with reasonable safety to person and property.'

512 U.S. at 98 (citation omitted and emphasis added). The turnover duty thus includes the logical corollary that the vessel "warn the stevedore" of any known or knowable hazards on the ship or with respect to its equipment, that (1) "would likely be encountered by the stevedore in the course of his cargo operations," that (2) "would not necessarily be known by the stevedore," and that (3) "would not [otherwise] be obvious to or anticipated by [the stevedore] if reasonably competent in the performance of his work." Id. (citation and internal quotations omitted); see also See Serbin v. Bora Corp., 96 F.3d 66, 70 (3d Cir. 1996) (citation omitted) ("The turnover duty comprises 'both a duty to provide safe conditions and a corollary duty to warn of known, non-obvious hazards' in instrumentalities and areas 'turned over' to the stevedore's control.")

For that reason, the turnover duty proves narrow when the alleged defect occurs in the cargo stow or cargo area (an area typically within the purview of the stevedores) rather than in the ship's gear, equipment, tools, or work space (an area typically under the control of the vessel owner or owner *pro hac vice*). Indeed, binding case law from the Supreme Court and Court of Appeals for the Third Circuit articulates three

guideposts critically relevant to the disposition of Grandslam's motion.

First, the vessel owner/owner *pro hac vice* "has no general duty" to supervise, inspect, or discover dangerous conditions "that develop within the confines of the cargo operations," a task routinely "assigned to the stevedore." Scindia, 451 U.S. at 172. Second, "the shipowner has no duty to supervise or inspect cargo loaded or unloaded by stevedores and therefore may not be held liable for injuries arising out of the stevedore's [own] failure" to properly perform its function. Derr v. Kawasaki Kisen K.K., 835 F.2d 490, 493 (3d Cir. 1987). Third, the turnover duty relative to defects in cargo operations "attaches only to latent hazards," i.e., not known, obvious, or anticipated conditions, and "encompasses only those hazards" that the vessel owner/owner *pro hac vice* knew of or should have known of "in the exercise of reasonable care." Howlett, 512 U.S. at 105.

Stated differently, in order to succeed on a claim against Grandslam for breach of the turnover duty, Plaintiff must show: (1) that a defect in the vessel, its equipment, or a latent defect in the cargo area caused the accident; (2) that the vessel owner/owner *pro hac vice* knew about the hazard or should have discovered it before turning over the vessel to the stevedore; (3) that the known or knowable hazard constituted one

of the type that the stevedoring company would likely or ordinarily have encountered in the course of cargo operations; and (4) that the hazard would not have been obvious to or anticipated by a reasonably competent stevedore. See Mullen v. Alicante Carrier Shipping Corp., No. 02-6722, 2004 WL 1737493 (E.D. Pa. Aug. 3, 2004) (citing Hill v. NSB Niederelbe Schiffahrtsges. MBH & Co., No. 02-2713, 2003 WL 23162396, at *3 (E.D. Pa. Dec. 30, 2003)).

**a. Plaintiff cannot establish a prima facie breach of Grandslam's turnover duty**

Plaintiff's claim relative to Grandslam hinges, in its entirety, upon his position that (1) Grandslam had an obligation under Scindia (and its progeny) to inspect the rope slings as part of the SANKO's equipment, and that (2) certain safety and operations procedures imparted an obligation upon Grandslam to supervise the stevedores' cargo operations. (See Pl.'s Grandslam Opp'n at 26-31, 37-38.) Nevertheless, neither of Plaintiff's positions find support in law or in the evidence proffered in this case, and so neither aspect presents an issue to be resolved by the factfinder at trial.

The Court notes, at the outset, that the damaged rope sling came aboard the SANKO after the vessel had been turned over to SK and the independent stevedores hired by SK, and during cargo operations in which Grandslam played no role (as a supervisor or

otherwise). (See Grandslam's SMF at ¶¶ 49-51, 116; Pl.'s Grandslam SMF at ¶¶ 49-51, 116.) Grandslam had turned the vessel over to SK before the plywood and slings were onloaded in Malaysia. (See Grandslam's SMF at ¶¶ 49-51, 116; Pl.'s Grandslam SMF at ¶¶ 49-51, 116.) Indeed, it is undisputed that Grandslam had no access to or control over the cargo rope slings that came aboard the vessel for the first time during the loading operations of Malaysian stevedores. (See Grandslam's RSMF at ¶ 118; Pl.'s Grandslam SMF at ¶ 33.) As a result, Plaintiff has not, and cannot, demonstrate that a hazard known or knowable to Grandslam existed on the SANKO prior to turnover. Rather, the undisputed record evidence plainly reflects that the hazardous condition (e.g., the "cut" rope sling) was introduced into the vessel after turnover, and in relation to an implement unconnected to the vessel, its equipment, or the cargo area.[37]

---

[37] The Court finds no support for Plaintiff's position that the rope slings constituted part of the SANKO's equipment rather than part of the cargo. (See Pl.'s Grandslam Opp'n at 26-29.) Indeed, Plaintiff concedes that only SK owned, selected, purchased, and provided the rope slings for use by the Malaysian stevedores, and that these slings came onboard the SANKO for the first time during cargo operations. (See Pl.'s Grandslam SMF at ¶¶ 33, 36, 50.) The Captain of the SANKO, its Chief Officer, and the DRS Captain then all consistently testified that the rope slings were not part of SANKO's equipment, and instead came aboard the SANKO as part of the cargo and solely for the purpose of discharging the cargo. (Valencia Dep. at 35:24-36:12, Purificacion Dep. at 24:6-14; Hassall Dep. at 197:8-15.) Plaintiff mounts no genuine challenge to this version of events, nor proffers any fact to suggest any involvement by Grandslam in the Malaysian cargo operations (or in any other way relevant to

Even more critically, in Howlett, the Supreme Court expressly rejected the notion that a vessel owner's turnover duty required it "to supervise the ongoing operations of the loading stevedore (or other stevedores who handle the cargo before its arrival in port) or inspect the completed stow." 512 U.S. at 105. Plaintiff's argument, by contrast, invites the

---

the rope slings). (See generally Pl.'s Grandslam SMF.) Rather, Plaintiff relies upon certain case and regulatory support—Prinski v. Blue Star Line Marine Ltd., 341 F. Supp. 2d 511 (E.D. Pa. 2004), Revak v. Interforest Terminal UMEA AB, No. 03-4822, 2009 WL 1362554 (E.D. Pa. May 14, 2009), and the Safety and Health Regulations for Longshoring, 29 C.F.R. § 1981, et seq. (hereinafter, the "OSHA regulations")–that does not advance his position. (See Pl.'s Grandslam Opp'n at 26-28.) Indeed, Prinski involved a defect in permanent parts of the vessel's physical structure (specifically steel archways on the main deck), 341 F. Supp. 2d at 514, and not cargo slings that came aboard only as a result of independent cargo operations (as here). In Revak, by comparison, the parties presented evidence that the "vessel leased the [broken] sling," "provided the [broken] sling to the stevedores," and "had the most direct access to and control over the [broken] sling." 2009 WL 1362554, at *7. As a result, the Revak court found an issue of fact on whether the broken sling constituted equipment. Id. Here, by contrast, Plaintiff concedes that none of the facts present in Revak exist here, except that Revak also involved a parted sling. (See Pl.'s Grandslam SMF at ¶¶ 33, 36, 50.) Finally, in relation to the OSHA regulations, the Court need only briefly mention that those regulations imposed obligations upon DRS as the stevedore employer and not Grandslam. See, e.g., 33 C.F.R. § 1918.62(d)(1)-(3). Beyond these plainly distinguishing features, defining the SANKO's equipment to include the rope slings at issue here would contravene the allocation of fault embodied by the LHWCA, because the injury here occurred outside Grandslam's traditional sphere of operation (the cargo area) and because of an instrument (a rope sling) to which it had no access or control. See Howlett, 512 U.S. at 101-05 (explaining that the LHWCA attempts to place liability for injuries upon the party that most controls the areas and instrumentalities involved in the injuries).

Court to reach the opposite conclusion, and specifically to conclude that Grandslam's turnover duty required it to continuously supervise the Malaysian stevedore and to inspect the cargo pre-slings that came aboard the SANKO for the first time during cargo loading operations. (See generally Pl.'s Grandslam Opp'n at 26-31, 37-38.) Such a requirement, however, would require vessels "to exercise scrutiny over a cargo loading operation" and "to inject themselves into matters beyond their ordinary province." Howlett, 512 U.S. at 103. Indeed, attributing a supervisory duty under these facts would "saddle [Grandslam] with precisely the sort of nondelegable duty that Congress sought to eliminate" through enactment of the LHWCA. Scindia, 451 U.S. at 169. The Supreme Court considered and rejected this precise sort of argument in Howlett, under facts even more supportive of the longshoremen than present here, and Plaintiff's position would run directly contrary to the Supreme Court's interpretation of the LHWCA.[38]

[38] In Howlett, the Supreme Court found that plastic sheeting supplied by the vessel and placed underneath cargo bags constituted part of the cargo stow (as opposed to the vessel's equipment). 512 U.S. at 94-105. Despite agreeing that the vessel had "no obligation to supervise and inspect cargo loading operations" and no constructive knowledge of any hazard, the Supreme Court ultimately vacated and remanded the lowers' courts grant and affirmance of summary judgment in favor of the vessel owner, on account of the fact that the lower courts did not address the fact that crew members testified to observing the plastic sheeting during loading operations (thereby creating the possible inference of actual knowledge on the part of the vessel

Simply put, Grandslam, after turnover to SK, had no duty to oversee the Malaysian stevedores that loaded the shipment of pre-slung plywood at issue in this action, and Plaintiff has advanced no fact suggesting that Grandslam had actual and/or constructive knowledge of the "cut" rope sling (a condition that, again, arose in connection with this vessel after the SANKO's turnover). As a result, Plaintiff cannot, as a matter of law, demonstrate that Grandslam breached its turnover duty under Scindia (and its progeny).

**b. No contract, positive law, or custom supplants the application of the general duties under Scindia**

Nor can the Court find that Grandslam's safety management system procedures created an independent custom or contractual obligation to supervise the stevedores' cargo operations. (See generally Pl.'s Grandslam Opp'n at 30-31.)

In Scindia, the Supreme Court made clear that its duties apply "absent contract provision, positive law, or custom to contrary." 451 U.S. at 172. Although Scindia does not define the type of custom or contract that could alter Grandslam's duty to longshoremen under section 905(b), no provisions impose such a heightened duty in this instance.

---

owner). Id. at 105-06. Plaintiff has presented no such evidence here, and in fact concedes quite the opposite.

Indeed, no contract exists between Grandslam and DRS, nor has Plaintiff identified any conduct that suggests a custom of enhanced supervision over stevedoring affairs. Rather, Plaintiff takes the position that three isolated provisions within the SANKO's internal safety management procedures and cargo plans somehow create an expansive duty of care beyond that of Scindia and Howlett.[39] (See Pl.'s Grandslam Opp'n at 30-31.)

[39] On the oral argument record of November 24, 2015 and briefly in his opposition, Plaintiff argued that the International Safety Management (hereinafter, "ISM") Code constitutes positive law that creates duties in excess of the LHWCA and general maritime law. (See Pl.'s Grandslam Opp'n at 30.) On both occasions, however, Plaintiff referenced the ISM Code only by name, and provided no citation or discussion of any allegedly relevant provisions. (See, e.g., Pl.'s Grandslam Opp'n at 30.) Congress codified the ISM code by statute, 46 U.S.C. §§ 3201-3025, and through federal regulations, 33 C.F.R. §§ 96.200-96.390. Few courts have addressed whether the ISM Code, as codified, creates duties running from vessels to longshoremen in excess of those set out in the LHWCA. Nevertheless, every federal court that has addressed this issue has concluded that it does not. See, e.g., See Horton v. Maersk Line, Ltd., 603 F. App'x 791, 797 (11th Cir. 2015) (rejecting the ISM Code as a basis for a negligence claim in excess of the LHWCA and Scindia, and citing supportive cases); Aronson v. Celebrity Cruises, Inc., 30 F. Supp. 3d 1379, 1396 (S.D. Fla. 2014) ("[T]he International Safety Management Code does not create any duties and thus cannot be the basis for a negligence claim against a cruise line."); Rinker v. Carnival Corp., 753 F. Supp. 2d 1237, 1243 (S.D. Fla. 2010) ("Plaintiff has failed to present any authority that establishes that the [Code] creates any duties that Carnival owes to Plaintiff."); Calderon v. Offen, No. 07–61022, 2009 WL 3429771, at *4 (S.D. Fla. Oct. 20, 2009) ("Congress merely desired to participate with other maritime nations in achieving safety goals [through the Code], but did not intend to change long-established rules of law which govern liability and its allocation in general maritime law."); Johnson v. Horizon Lines, LLC, 520 F. Supp. 2d 524, 533 (S.D.N.Y. 2007) (finding that the regulations implemented under the ISM Code

Plaintiff references, in particular, the language in the Management of Safe Operation Rules that states that "the Chief Officer shall control and supervise cargo operations" (Ex. 30C to Pl.'s Grandslam SMF at § 7.2.1); the provision in the Procedure for Bulk Carrier/Cargo Ship Cargo Operations that notes that "[t]he Master shall assume overall responsibility for supervising the cargo operation in bulk carriers and other cargo ships and shall confirm such work result..." (Ex. 31 to Pl.'s Grandslam SMF at § 3); and the part of the Cargo Operation Plan for Unloading Plywood in Crates that directs "**Officers and Crew on Duty**" to "secure the safety of personnel[] working with the cargo" and to ensure "safe operation" of the "equipment[] and tools for cargo operation." (Ex. 32 to Pl.'s Grandslam SMF at § JJ (emphasis in original).)

Even a cursory inspection of these documents reveals that they amount to little more than an instructional guide to provide direction to the ship's officers, and not a contract with any other entity nor any effort to modify maritime custom relative to cargo discharging operations. (See Exs. 30C, 31, &

---

were "cast in general terms which restate principles already well established by American case law," and thus should not be construed as imposing additional duties). Because Plaintiff has not cited any specific portion of the ISM Code that provides support for the duty he alleges, nor any precedent that recognizes the ISM Code as a basis for a negligence claim, this Court joins the weight of authority in finding that the ISM Code provides him with no relief.

32 to Pl.'s Grandslam SMF.) Indeed, these documents do not mention longshoremen, the stevedores, or cargo-oriented tools (like, rope slings), and they speak primarily (if not exclusively) in terms of the SANKO crews' responsibility for the SANKO equipment used in connection with cargo operations (like, the crane, hatch covers, and deck lights). In that way, when viewed as a whole, each document reflects an obvious intention to remind the SANKO's officers and crew of the importance of conscientiousness in the high-risk world of international maritime travel. (See, e.g., Ex. 30C at § 1.)

Indeed, because the vessel and its crew cannot remain entirely "detached from cargo operations," vessels routinely take "responsibility" for preparing cargo-oriented plans and safety procedures. Howlett, 512 U.S. at 103. Nevertheless, vessel owners construct these documents with the expectation that "the stevedore, the independent contractor hired for its expertise in the stowage and handling of cargo," will be "charged with actual implementation" of the various procedures. Id. And, because Plaintiff has identified no actions by Grandslam in relation to cargo operations, the undisputed record supports only that conclusion.

For these reasons, the Court finds Plaintiff's reliance upon internal safety guides misplaced as a basis to enhance the otherwise-applicable Scindia duties. See Goldsmith v. Swan

Reefer A.S., 173 F. App'x 983, 988 (3d Cir. 2006) (declining to conclude that a contract between parties other than the stevedore, and not enacted for its benefit, expanded a vessel's duty relative to the safety of longshoremen); Mullen v. Alicante Carrier Shipping Corp., No. 02-6722, 2004 WL 1737493 (E.D. Pa. Aug. 2, 2004) (examining the contract provision exception in Scindia, and determining that it only applies if the contract provision specifically involves a duty to discover dangerous conditions related to longshoremen); Horton, 603 F. App'x at 796-97 (rejecting a ship's safety manuals and the ISM Code as a basis to modify the standards set forth in section 905(b) and Scindia); Celestine v. Lykes Bros. S.S. Co., 729 F. Supp. 691, 694 (N.D. Cal. 1989) (same).

For all of these reasons, Grandslam's motion for summary judgment will be granted.[40]

**2. Turnover duty of SK, the "time charterer"**

Although the overwhelming weight of authority makes plain that "time charterers," like SK, qualify as a vessel within the meaning of section 905(b), equal authority states that the duties applicable to a vessel owner differ from the duties imparted upon a vessel owner/owner *pro hac vice*. In general, a "time charterer" that has no control over the vessel assumes no

---

[40] Grandslam shall advise the Court of the impact of this decision, if any, upon its Crossclaims within seven (7) days.

liability for negligence, unless the harm occurs "within the charterer's traditional sphere of control and responsibility or has been transferred [to the charterer] by the clear language of the charter agreement." Kerr–McGee, 830 F.2d at 1343; see also Mullen v. Hoyu Kaiun Kabushiki Kaisha, No. 88-8311, 1990 WL 55090 (E.D. Pa. 1990) (same), aff'd, 922 F.2d 832 (3d Cir. 1990); Irby v. Tokai Lines, No. 88-6890, 1990 WL 18880 (E.D. Pa. 1990) (same). In other words, a "time charterer" may be liable to a longshoremen only if the "time charterer" acts independently negligent or otherwise unreasonably in relation to its own charter activities. See Browning v. Safmarine, Inc., No. 11-2436, 2012 WL 6089481, at *3 (D.N.J. Dec. 5, 2012); Weeks Marine, Inc. v. Hanjin Shipping, No. 04-1703, 2005 WL 1638148, at *4 (D.N.J. July 12, 2005).

As applied here, in order to prevail on its negligence claim against SK, Plaintiff must demonstrate that SK acted with independent negligence, or unreasonably under all of the existing circumstances, in relation to the cargo pre-slings.

**a. Genuine issues of fact preclude the entry of summary judgment in favor of SK**

In support of its request for summary judgment, SK submits that Plaintiff's claims as against it rely upon little more than "bluster and conflation," because Plaintiff has adduced "no evidence [from] which to prove that any actions SK took or

failed to take proximately caused [Plaintiff's] injuries." (SK's Reply at 1.)

The Court, however, finds that SK's position ignores the realities of SK's involvement relative to the cargo rope slings and its general supervision over the stevedores' cargo operations. Indeed, SK's argument on summary judgment centers upon (1) SK's delegation of its sling management process to an independent contractor, (2) the fact that it did not control the SANKO during the loading, voyage, or discharge, as well as (3) its entitlement to rely upon the expertise of DRS (and its related assertion that DRS should be called to answer for its own negligence). (See SK's Br. at 35-42; SK's Reply at 4-8.)

Nevertheless, even if the Court accepted each of these positions (which it does not), the Court may not ignore the record evidence that reflects (1) that SK selected, owned, and supplied all of the pre-slings carried aboard the SANKO, including the "cut" rope sling at issue here; (2) that SK did not "carefully" inspect the conditions and/or safety of the rope slings; (3) that SK's own conduct, coupled with its internal policies, support an inference that it actively supervised the cargo operations of its international and domestic stevedores; and (4) that the question of whether the "cut" sling proved open and obvious cannot be resolved upon the competing evidence

adduced here. For purposes of the pending motion, however, the Court need only elaborate on the most-striking examples.

Critically, at all times relevant to this action, SK required its port captains to follow SK's "Guideline[s] for Sling Management" (hereinafter, the "Guidelines"). (See Ex. 21 to Pl.'s SK SMF.) These Guidelines specifically required the "discharging" and "loading" port captains to "carefully check," "inspect," and "supervise" sling quality, condition, and use during cargo operations.[41] (Id.) During loading operations in Tanjung Manis, Port Captain Kim, in turn, declared that he "instructed and informed" the stevedores "regarding the usage of slings," and then "loaded all cargo[]" without incident and under the "control" of SK's "sling management procedures." (Ex. 22 to Pl.'s SK SMF (capitalization omitted).) Indeed, during his deposition, Captain Kim reiterated that his role as the Malaysian Port Captain required him to "carefully check and supervise the condition" and "use" of the slings, to ensure the safety of the loading stevedores, and to supervise overall cargo operations (during and after loading). (Kim Dep. at 18:3-21,

---

[41] In that way, the Guidelines markedly differ from Grandslam's internal safety procedures which do not require supervision and/or inspection of slings (or any other cargo-related implements). (Compare Ex. 21 to Pl.'s SK SMF, with Exs. 30C, 31, & 31 to Pl.'s Grandslam SMF.) Beyond this plainly distinguishing feature, SK's Port Captains actually participated in the cargo operations, as explained herein. SK's role relatively to the cargo operations therefore proves contextually different from Grandslam's uninvolved role.

44:22-46:2, 59:13-61:6, 104:8-113:19 (emphasis added).) Nevertheless, Captain Kim acknowledged that he performed only a "visual inspection" of the over 22,000 slings. (Id. at 112:6-9.)

During discharge in Camden, Port Captain Joo similarly declared that he "instructed" the stevedores regarding the usage of slings and that, despite Plaintiff "accident," SK kept to its "sling management procedure before discharging and during discharging for safe[] working." (Ex. 38 to Pl.'s SK SMF.) Indeed, during his deposition, Captain Joo testified to significant communications between himself and DRS supervisors relative to various aspects of DRS's discharging operations (see, e.g., Joo Dep. at 76:11-82:22), and specifically stated that he "checked the conditions of [the] plywood and [the] conditions of the slings" with DRS Captain Hassall. (Id. at 85-307.)

Taken together, this evidence, viewed in the light most favorable to Plaintiff as the non-moving party, depicts SK as intimately involved in the cargo operation of its stevedores here and abroad. Indeed, this evidence suggests that SK took (through its port captains and the Guidelines) an active role in ensuring the usability of the rope slings and in ensuring the overall safety of its stevedores. Despite the seemingly pervasive involvement, however, this evidence equally suggests

that the Port Captains implicated in this instance arguably erred in fulfilling the requirements reflected in the Guidelines and in their own testimony, particularly those related to ensuring the safety of the rope slings. Against that backdrop, this Court cannot conclude that SK acted reasonably under all of the existing circumstances as a matter of law, because this collective evidence, examined in the light most reasonable to Plaintiff, creates at least a reasonable inference of negligence.

**b. Genuine issues of fact preclude a finding that the "cut" sling was "open and obvious"**

Nor can the Court conclude upon this record that the "cut" sling proved so "open and obvious" that it excuses any fault of SK relative to the condition of the sling.

As relevant here, obviousness turns upon whether "a reasonable longshore worker under all the circumstances would actually have noticed the hazardous condition" and "would actually have appreciated the true significance (probability and gravity) of the threatened harm." Davis v. Portline Transportes Maritime Internacional, 16 F.3d 532, (3d Cir. 1994) (citations omitted). When confronted with "obvious" hazards, a "time charterer" like SK can ordinarily "'rely on the stevedore (and its longshore employees) to notice obvious hazards and to take steps consistent with its expertise to avoid those hazards where

practical to do so.'" Hill, 435 F.3d at 409 (quoting Kirsch v. Prekookeanska Plovidba, 971 F.2d 1026, 1031 (3d Cir. 1992)). As a result, a "time charterer" "'may be liable for failing to eliminate an eliminable [or open and obvious] hazard only if it should have expected that its expert stevedore would not avoid the hazard and conduct cargo operations safely.'" Id. (quoting Kirsch, 971 F.3d at 1033).

Given the nature of the discharging operations in this instance, however, it remains unclear whether DRS's "hold" longshoremen should have immediately recognized the condition of the "cut" sling. Specifically, although the "cut" itself rested close to the "eyes" of the slings, the record evidence leaves some doubt concerning the orientation of the "cut" sling on top of the plywood bundle (thereby creating a question on whether the "cut" should have been visible on the resting sling) and whether the DRS "hold" longshoremen connected the slings to the spreader assembly in a way that would have given them a clear view of the "cut" (thereby creating a question on whether the "cut" became visible once lifted off of the bundle). (See, e.g., Mortorano Dep. at 86:18-89:18.) Indeed, one of the "hold" longshoremen specifically testified that the rope sling at issue here "looked good" from his vantage. (Id. at 89:17-18.) The Court cannot resolve this disputed evidence in the context of summary judgment. See Davis, 16 F.3d at 538-39 (reversing a

district court's obviousness finding, based upon testimony that the longshoremen did not observe the hazardous condition); Williams v. Precious Cliffs, Ltd., 2006 WL 2057891, at *4-*7 (E.D. Pa. July 21, 2006) (denying the "vessel" defendants' motion for summary judgment, in light of factual issues on the obviousness of the hazard).

For all of these reasons, the Court finds that factual disputes preclude the entry of summary judgment in favor of SK. See FED. R. CIV. P. 56(a).

## V. CONCLUSION

For the reasons explained above, Grandslam's motion for summary judgment will be granted, and SK's motion for summary judgment will be denied. An accompanying Order will be entered.

**December 8, 2015**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge